Attorney of Allegheny, Ms. Gibbons. May it please the Court, Mary Gibbons for Appellant Hauck. I have asked the clerk to, would it be possible for me to reserve five minutes in rebuttal time? Sure. Thank you. I would also like to thank this panel for its courtesy to me in extending this case when I was taken ill last year. I very much appreciate that, and I very much regret having to reschedule. Well, you look very healthy, and we hope that that's the case. Thank you. I hope so, too. This case, because this case does involve the issue of an actual innocence claim being raised as a gateway to the district court's consideration of procedurally defaulted claims. I just have to ask you something about that. Yes. I went over this case, and I saw here that on page 21 of your brief, you said, The appellant urges this court to reverse the district court's denial of relief on these claims, which have found to be defaulted, in that it failed to consider his sufficient showing of, quote, actual innocence, and so forth. Correct. However, if you look at footnote number 3 on page 5 of the magistrate judge's report and recommendation, the magistrate judge says that petitioner argues that he has established cause and prejudice for his default, and the magistrate judge pointed out that you could establish either cause or prejudice or a fundamental miscarriage of justice, which would be included in the claim of innocence. But the magistrate judge doesn't indicate that that was advanced. The magistrate judge says petitioner argues that he has established cause and prejudice for his default. Correct. And the question I have is, did you in the district court, or did your client at that time, push actual innocence? And if so, where can we find that in what we have? Because I don't see where it was pushed. Well, where we have it is initially he submitted additional affidavits from witnesses indicating the existence of a logbook that would have reflected the signatures when he picks up his son from daycare right at the time that the assault is occurring. At the trial or subsequently? This is the traverse. He's submitting this affidavit attached to the traverse. He submits his petition. The respondent answers, and then he comes back with a traverse that says, here are these affidavits that say there was a logbook, my lawyer never went and got the logbook, here's another witness who saw the whole assault and said I wasn't there. I understand the basis for the claim of actual innocence. I mean, I can understand that. Yes. But what I can't understand is whether the claim was, I can't see where the claim was packaged as an actual innocence claim, even though there was a basis for an actual innocence claim. Now, maybe it wasn't one that would be upheld, but there would be a reason why. First of all, nothing says actual innocence louder than a notice of alibi filed right at the time before trial, obviously. The entire defense here was I wasn't there. No, but you have to make a claim on the habeas of actual innocence, and you should say or the person should say, well, there may have been a procedural defaulter because of a fundamental miscarriage of justice. Based on my actual innocence as supported by these affidavits, I should consider this. It is my belief that he did not use any incantation of the magic words, saying I should have a gateway through. This Court in Hubbard, Mr. Hubbard didn't do that either, and the Court also noted that in a, you know, in the pro se habeas context, the fact that the facts have been presented in such a fashion that the issue of actual innocence is flat out there for the Court to see, that it should be considered and dealt with as a part of the consideration of procedural default. But did the magistrate judge, well, of course, I know the district judge didn't adopt the report. Did the magistrate judge say that I can't open the gate here because they didn't establish a basis for a claim of actual innocence? I can't either. That's different. That consideration, that's the analysis that was missing, was saying, yes, there's an opportunity to go through the gate here with actual innocence, and he submitted a few things here, but I reject them. That's what didn't happen, and that's what should have happened. Why should it have happened if he didn't make the claim characterizing it in that way as an actual innocence claim? It's not, so far it is not the law in the circuit that he has to raise the flag with the magic words that the excusal is either by cause and prejudice or by fundamental miscarriage, and therefore the magistrate judge should have, in the context of his traverse, where he's actually putting forth new evidence. All right, judges, before I go off the podium, I'll just ask one more question. In that event, should we remand the matter and tell the district court to reconsider this matter as an actual innocence claim and make the analysis? Because I don't think the analysis was ever made. That is one potential remedy that we would accept and agree with and seek from this court as a possible outcome so that the district court, from the beginning, could make that analysis and possibly appellant could seek a hearing on that. On that line, I'm sorry, on that same line, I don't have the second volume of the appendix with me, I'm embarrassed to say, but at 127, my notes indicate that at the appendix at 127, which I believe will be Houck's reply, he says, quote, Petitioner has taken the opportunity to submit to the court the overwhelming evidence in support of his innocence and demonstrate counsel's negligence, unquote. So my question to you is, if that is in his reply before the district court and magistrate judge, is that enough to raise the actual innocence issue before the magistrate or not enough to package it the way Judge Greenberg mentioned? Well, certainly, by attaching the affidavits at all, by characterizing them in that fashion, he's not using the magic word gateway. And he's not saying, excuse procedural default. He's a pro se litigant. Hubbard didn't do that either, and the court said, we still have to consider this. So he's certainly presenting the issue of his innocence. The issue of his factual innocence is everywhere in this case. And in House, the court also looks at the whole issue of identity and motive. And those are the two big issues when you're talking about factual innocence. I wasn't there is the issue that he's putting forward. Let me ask you a different question relating to the new evidence that was presented or that you wanted to present here. And the question is whether House is really a proper analogy in terms of the facts. As I understand it in House, the new evidence pretty much contradicted the inculpatory evidence that convicted the defendant. Whereas here, would it be fair to say that the new evidence has a great deal of similarity to the evidence that was presented to the jury? That is, in finding how guilty, the jury, I think, must have disbelieved his testimony, must have disbelieved the alibi testimony presented by Tequila and Deborah Harris, and must have disbelieved Clonetta Hill's exculpatory eyewitness testimony. So the new evidence, it would seem, is to some degree cumulative or of the same kind of evidence. So is it really the kind of evidence that carries the day on an actual innocence? Well, Schlupf anticipates three different sort of large categories of new evidence that can be presented. And that is the scientific evidence, which obviously was predominant in House, and also identifies trustworthy witnesses and physical evidence. And we've got an example of each in the affidavits that he submits. He submits a trustworthy witness, Kelly Edwards, who's somebody who no one has demonstrated has any relationship or affinity to him, who's saying, I was there, I saw the assault, he wasn't a part of it. So that's a trustworthy witness. More trustworthy than others, Clonetta Hill? More trustworthy? We don't know because we haven't had a hearing on this, but nevertheless the state has, or the Commonwealth has, you know, attacked the witnesses presented on the grounds that, well, you all had some connection to Houck and that they should all be disbelieved. How about more trustworthy than Houck himself? It's his confession that was the centerpiece of the prosecution evidence, right? Yes, since there was pretty much nothing else. So in the face of a confession, how are we to look at the reliability of people who come in after the fact and say, well, he wasn't there? Well, unfortunately, you know, in the recent months, years, there has been an enormous amount of research and study and learning on false confessions. That's not really germane here because Houck says he didn't make the confession that the officer says he did. There's no tape recording of it. There's no signed notes. There's no signed, you know, statement. There's no nothing that corroborates it. And, in fact, the confession itself contains a very serious misstatement regarding the caliber of the gun. And it is a mistake that was originally made in the police report and then is picked up again in the confession. Houck was not responsible for saying, for identifying the caliber of the gun. It was misidentified in the police report. And then the recounting of what he said incorporates that very same mistake. I think that's a huge credibility problem with the confession and whether or not he actually made it. Another witness, a witness who comes in and says, I was there. I watched the whole thing, and he wasn't there doing it, is incredibly significant in regards to whether or not we should believe him that he really didn't ever confess. There's already a chink in the armor of that confession, and this would quite possibly create a huge crack, and it would disappear as a basis for convicting him. Do you have any obligation or your client have any obligation to show that this evidence wasn't available at the time of the trial? Well, this is a very interesting legal question in this area that, in fact, there's a split in the circuits on. This circuit has not imposed that requirement, and the respondent has cited, I believe it's Antwin, Antwin, an Eighth Circuit case which does impose that requirement. It's Amrine, I'm sorry, Amrine v. Bowersox. And there exists a split in the circuit on. Wouldn't it matter if you're talking about a negligent counsel as opposed to actual innocence? I had a case here some years ago where a defense attorney had a real high witness who swore that the defendant didn't do it, but she was with him and was available because it happened to be his grandmother, and he didn't call her. In fact, he never interviewed her. But I can see if you're talking about ineffective assistance of counsel that, well, of course the evidence wasn't presented. If it was, then the counsel wouldn't have been ineffective. And that's what we have here. Those are the defaulted points. But is that distinct, though, from actual innocence? Suppose it's not an ineffective assistance of counsel claim but an actual innocence claim, and yet you can demonstrate that this evidence was available and should have been discovered. Could you then make an actual innocence claim? The law in this circuit doesn't preclude you from doing it. Does it address it? It does not say, and you have to prove that with the exercise of due diligence, you would have discovered this and presented it. Fortunately, that's, I think, not an issue that this case clearly presents because the very issues that he's defaulted out on are the issues involving his counsel's failure to examine the scene, interview the witnesses, go over to Mount Zion and get the logbook. I mean, this is not an effort to supplement the record in any way, but I picked up the phone and I called the Mount Zion church, daycare center, whatever its title is. I mean, how hard is that? But no one did that. No one presented that. Let me read you something from Schlupp and ask you if I'm correct that this is the standard that we're looking at. The standard requires the habeas petitioner to show that a constitutional violation has probably resulted in the conviction of one who's actually innocent. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. That's the standard, right? Okay. If that's, and that's the standard just to get to the review of the constitutional claims. The defaulted claims. The defaulted claims. Right. So here we have a circumstance where the alibi evidence presented is I was at my school, then I got home, and my girlfriend's mom and her boyfriend fought. I had to get between them, and that's how I got blood on myself. It was really from my. . . I got something that looked like blood on myself. Okay. I got some red stuff on myself from the boyfriend who was in an altercation with my girlfriend's mother. Then people came and picked me up in a red Taurus, and I had no idea a guy was in the trunk. And that's how I ended up with what appeared to be blood on me and a fellow in the trunk as I was hiding away from the car. Now, under those circumstances. . . Let me ask you this. Would it be a real stretch for a juror to think, that's kind of a bit of a Rube Goldberg set of circumstances to get this guy in the car with blood all over him and a guy in the trunk, and therefore I'm disbelieving his alibi? The odd thing about the gateway innocence is that we have to consider evidence that the jury never heard. We're not in a situation where they heard this evidence and then rejected credibility. We have to look at this, the new evidence, and we have to look at the whole package, the weaknesses as well as the strengths of what was presented against him. And the standard is not Rube Goldberg or not Rube Goldberg. The standard is beyond a reasonable doubt. Well, the standard is, is it the case that no reasonable juror would have convicted on that whole set of evidence? And I guess what I'm asking you is, could a reasonable juror looking at the whole thing say, that story just sounds so concocted to me that I can disbelieve this stuff, even with the new evidence? If that reasonable juror is sitting there looking at a logbook that says LaFond Howe picks up LaFond Jr. at 430 and his signature is there and people come in and say, yeah, I saw him there, which one of the affidavits does,  tell me what time the abduction occurred, then I think that no reasonable juror would convict. If we've got his signature and let's get a handwriting person to come in and say, yeah, that's his signature, and a person to come in and say, yeah, I saw him there with the kid and they were walking home and all the other things. How he got in the car later on. With blood on him and a guy in the trunk. I mean, one of the interesting things in this case is nobody. And a mask in his pocket. Well, interesting. It's described as a mask. However, the people who saw the kidnappers said they were Halloween masks, whereas what he had in his pocket was like a ski type thing. That raises another question back to Kelly Edwards. As I understand it, her affidavit said that she witnessed the beatings and that Hauk was not one of them. But if they were wearing masks, does she say how she recognized the assailants? Or knew that? When you cross-examine Kelly Edwards, we'll have the answer to that. But at this point, she's saying, I know it wasn't him. But there were two witnesses who said that they were wearing masks. So maybe the two witnesses were not telling the truth. Or maybe it was something about the way he walked or something about what he was wearing or something about his hands or his skin tone or the million other things that can lead people to say, you know, yes, I know who that is. You know, it's almost Halloween. Sometimes kids come to your doorway and you know who they are, even though they're dressed up as Snow White. You know that's. Good rhetorical point. I'd still like to keep my five minutes. No, you're going to be able to keep it. Don't worry about that. Okay. Any other questions? Good. Thank you, Ms. Gibbons. Thank you. Ms. Pettit. May it please the Court. Rasheen Pettit for the Apoly. Good afternoon. I think the first thing I'd like to respond to is related to the issue of the alibi. And I would like to correct something in that the trial testimony did not establish the time that the assault took place. In fact, the testimony on that varied greatly. One of the witnesses who called 911 testified that the assault took place at 3.30, whereas the victim himself stated that it was 5 p.m. And the police officer who responded to the 911 call, his incident report also said 5 p.m. So when we're looking at Ms. Simpson as an alleged alibi, we have to consider the fact that even if she could say that she saw the appellant at 4.30 at the school, even if a logbook would, in fact, show that, that does not provide him with an alibi. Also, Mount Zion School is less than five miles away from where the assault took place. So when we don't have a firm time frame, the prosecutor never argued to the jury that the assault took place at 4.30 p.m. And when they are so close in proximity, it's not as though Ms. Simpson is going to place him on the other side of Pittsburgh, for example. That's really not providing an alibi for him. And that evidence, when we look at it again with a holistic all-evidence approach, is not going to undermine the confidence that we can have in the outcome and the verdict in this case. You seem to suggest that Schlepp requires the petitioner show that late proffered evidence could not have been discovered earlier, right? I do believe that, yes. If that's the case, then how could a petitioner who wants to make a claim that my counsel just didn't do his job ever get a hearing? Wouldn't that automatically mean that if your ineffective assistance to counsel assertion is that my counsel just flat out didn't do what they were supposed to do, yet there wasn't reasonable diligence, that's my complaint. Doesn't your view of it cut off that claim completely? Not in this case, no, Your Honor. And I can tell you why. There's a couple reasons, actually. The first thing I want to point out is the timing issue here. This issue was raised six years after his trial took place. This is classic 11th hour affidavit vouching. That's what we have here, and our case law tells us that we are permitted to look at the timing of the submission of the alleged new evidence in assessing its credibility and its reliability. I believe that's House v. Bell, and I know that this court also said that in Goldblum v. Clem. So when we look at that, that's already casting a great suspicion over this. And also, regardless of when you have an ineffectiveness claim, you are required to exhaust that in the state courts. And Mr. Houck did not do that. The first time he presented this ineffectiveness claim, that my counsel didn't find Ms. Simpson, my counsel didn't find Ms. Edwards, was in his traverse, which was filed in April of 2005. Doesn't that then go back to the point that if your point is that there was a failure to investigate and that you will only learn about this stuff late, that's part of your actual innocence assertion, a fundamental miscarriage of justice. I mean, that's the whole way you get around a procedural default. How can we logically follow what you're suggesting we do, which then brings procedural default back into it? Do you understand what I'm trying to ask? I believe so. I believe the report and recommendation addresses that in a way in citing the case Murray v. Carrier, where they state that even if counsel is responsible for some of the procedural default, you needed to raise that in state court. Because I believe that when we look at the habeas petition, habeas corpus, and there is an inherent duty for the defendant himself to act diligently and to exercise due diligence. We see that in our statute of limitations, in the exhaustion requirements, in the standard for getting an evidentiary hearing. I don't think that we can separate that wholly, even when you are asserting an ineffectiveness claim. And Murray states, even if your claim is, in your ineffectiveness claim, you're stating that as a reason or an excuse for your procedural default, there still is an obligation for you to exhaust that in state court. So what I'm suggesting is that Mr. Houck, upon supposedly discovering this evidence for the first time, needed to, in fact, file for a stay in his habeas petition, go back to state court and raise this properly under the PCRA, under after discovered evidence exception to the statute of limitations. And I do believe that the submission and the timing of this is very suspect and really causes problems with the credibility and the reliability of the evidence itself, which would in turn affect the credibility of any ineffectiveness claim. I can follow that, but let's assume you had a situation where there was irrefutable evidence of innocence. The actual innocence standard might not be of any help at all if you can make, if the prosecution can make a plausible argument that maybe this could have been discovered earlier. Well, I don't know if, I mean, when we look at a case like House v. Bell, where they did, in fact, find that the actual innocence standard was met, probably because there was very, very strong scientific evidence there. The courts have been willing to say, okay, you've met this very high burden, you've met this stringent standard, and you can pass the gateway and we'll remand it. Maybe they get to the right result in a different way. Perhaps, but in this case, I do think it's very clear that he has not met the gateway standard. It's not even, even in House, where you had DNA testing that directly, pretty much destroyed the government's case against the defendant and it directly contradicted their key pieces of evidence. They did find that he made the actual innocence standard, but even then they said, this is a close case, but you've passed it the gateway. I mean, when we compare House to this case, it's like day and night. I mean, like you had stated, the one witness is offering cumulative testimony to what was already offered at trial, that is the eyewitness. The purported alibi, again, is not actually providing him with an alibi. Ms. Simpson's affidavit is not directly contradicting the government's case. In fact, if we actually look at her affidavit, it never even states what time she supposedly saw him at the school. Look, Lee, I've made a suggestion to counsel that, well, maybe we ought to remand the matter and let the district court directly address the actual innocence argument, but I wonder if that's right because there was no plenary hearing here. I'm not sure that the district court can do the determination of the adequacy of the evidence to make the gateway any better than we can, frankly. Well, I have to say that when I reviewed the record, I was in agreement that I don't believe that Mr. Houck actually presented a claim of actual innocence in his pro se pleadings. Understanding that he was a pro se litigant and looking at it with that relaxed lens that they talked about in Hubbard, I believe, I did read through his pleadings, and it's very clear that he was raising the cause and prejudice exception to the procedural default. He understood it well enough to do that. He stated, I know these are defaulted, but here's my cause. It's ineffective assistance of counsel. And the report and recommendation, and the appellant concedes this in her brief, did a very detailed analysis of the cause and prejudice standard and why he did not, in fact, meet that, why ineffectiveness was not going to get him over the default. So I'm in agreement in the sense that, you know, yes, there's a relaxed lens when we look at his pro se pleadings. However, actual innocence is extraordinary relief. It's very rare. And if you're looking to get that relief, you have to at least somehow file something that's implying or indicating that that's what your claim is. Do you have the appendix? I do. If my colleagues will indulge me, I'll ask you to look at page 127 and tell me if that isn't Houck in a reply saying, I'm submitting, quote, overwhelming evidence in support of innocence. Okay. Is that all right? I believe you if you say that's what it is. Well, I've got notes here. I don't have the document. I'm just, that's my bad. But rather than saying he's at least got to indicate in some way that he's talking about actual innocence, I'm wondering if he didn't, in fact, do that in a reply. What page, I'm sorry? 127 of the appendix. Okay. In fact, that section is highlighted in my copy of the appendix because I do believe that was the only instance that I found where he used the word innocence. Under the relaxed lens, as you put it, is that enough for us to say, hey, this guy tried to bring it up? I would submit that it's not. Again, when we read through his pro se pleadings, he put forth all the proper standards for, you know, he understood default. He understood that he had to try to overcome that. By just stating here is, you know, I'm giving you evidence of my innocence, I don't believe that that covers it. But, again, even if we want to assume that he properly raised that, he fails to meet that standard. And he fails to meet that standard because his evidence isn't new or because it isn't persuasive or why? Everything. Let's assume we say it, we're not convinced by the newness argument. Correct. I was going to say, in the Appley brief, we explain why we don't believe that he meets the first prong, why it's not new, reliable evidence unavailable at trial. But even if we assume for the moment that he does in fact meet that prong and we focus on the second prong, this evidence does not undermine the confidence that we can have in the outcome. Again, in looking at the alibi, she doesn't say what time she supposedly saw him. And, again, even if we want to give the benefit of the doubt that she would testify consistent with him, saying that she saw him at Mount Zion School at 430 is not providing him with an alibi. When we look at the timing of the submission of this evidence, it's very suspect. Literally the first time we've heard of Ms. Simpson is when he filed his traverse. All along in his Fed and in his amended Fed, he stated that his alibi was going to be Tracy. And is this point going to the persuasiveness of it or to the newness of it? I believe, and I think it's Goldblum also agrees, that when you're assessing reliability, there's overlap. So, yes, that goes to prong one, but it also is very relevant to the second prong in considering this evidence. Because when we're looking at all the evidence, old and new, you have to somewhat make some type of credibility assessment as to the new evidence and how that would affect the reasonable juror. And when we're looking at this, the question is, okay, let's consider Ms. Simpson's affidavit and Ms. Edwards' affidavit. In light of all of this, would all 12 jurors now change their minds? And I would submit absolutely not. Do you separate out Ms. Simpson and Ms. Edwards because those two affidavits are qualitatively different? I mean, I can understand at least an argument that the two affidavits having to do with signing Mr. Houck's son out of daycare or out of the school are not new because that's just duplicative of stuff that's already there. But Ms. Simpson's and Ms. Edwards' affidavits are new, at least in the sense that nobody before had said, hey, I witnessed this and I can tell you he wasn't there. Or, well, you understand what I'm getting at. That's not duplicative of something that was already in the mix, right? Actually, Ms. Edwards is. Her testimony or her affidavit is cumulative to Ms. Hill's trial testimony, which was, I saw this assault taking place and Mr. Houck was not one of the assailants, despite, as was pointed out, the fact that both of the eyewitnesses and the victim said that the assailants wore masks. Somehow or other, Ms. Hill testified at trial and Ms. Edwards' affidavit says it was not Mr. Houck who took part in the assault. So that is also cumulative. How about Ms. Simpson's? Ms. Simpson's is cumulative in the sense that Mr. Houck himself testified, hey, I was at school at that time, and his soon-to-be mother-in-law testified that she picked him up on the street at either 4.30 or 4.45 p.m. So that information was already before the jury. But isn't there cumulative and then cumulative, other kinds of cumulative evidence? That is, if two people say that I witnessed the beating and the defendant was not the one who did it, it seems to me that that's a bit more important than one person saying it. Again, that is possibly true in other cases, but when we're looking at this case, again, considering everything, the defendant's voluntary statement to the police, which the defense explored the things that Ms. Gibbons was discussing about the confession itself, and he did testify, oh, I never made that confession, but the fact is that confession was part of the evidence. The officer's testimony, including finding the defendant with the bloody shirt, the bloody mask in his pocket. And we have to remember that when the superior court reviewed this case, they stated that they found overwhelming evidence of the defendant's guilt. So again, in looking at this with the holistic approach, I don't believe that this supposed new evidence is going to meet the Schlupp standard. Remind me again what was Houck's explanation about the body and the feet sticking out and all of that. He said he never saw it? Correct. His story was that he never noticed that there was somebody in the trunk of the car or in the car or... Now, the feet, as I understand it, the compartment between the trunk and the rear seat was taken out or was down or something. Seat was down. Yes. So was it his trunk, the lower part of his body that was in the back seat, or the other way around? At trial, when he was questioned about that, he had no answer or no explanation for that. Now, I do know that the appellant in the brief states that the back seat was not actually down at the time while he was in the car. However, that's not part of the record that I can see. That's not part of the trial testimony. But the officer saw. Yes. The officer testified that when he approached the car, the back seat was down. Half of the victim's body was in the trunk, and half of it was in the back seat. And when questioned about that, Mr. Houck didn't have an explanation as to how he did not notice that or did not see that. I don't have anything else. Any other questions? Good. Ms. Pettit, thank you very much. Thank you very much.  I just have one question, Ms. Gibbons. As I understand it, the logbook itself from the school was not presented to the district court or a copy of it. Correct. Why was that? Because wouldn't that show any sign? Personally, I was not counsel in the district court, so I don't know why the logbook wasn't there. Just as a matter of informing the court, and I'm a little reluctant to do this because it's outside the record, but when I called to Mount Zion... It happens all the time. Well, when I spoke to the people at Mount Zion, they've changed pastors a couple of times, and they don't have the school, and a lot of things have changed there since 97. So I think that it would take more than a friendly phone call from me. It would take a subpoena. It would take some more doing to get whatever records might be sitting in the basement of the Mount Zion daycare center. And I don't think that Mr. Howick, acting pro se from prison, is really in a position to do that. But the school is still there, so there's still a possibility. If I could just address the question regarding the impact of having a second person, a second witness say, I saw this happen, and it wasn't out. It's important to remember that there were no witnesses who said, I saw it happen, and it was out. Nobody said that. Not a single identification witness in this trial said he did it. Well, didn't the victim say they were wearing masks so I couldn't see their faces, but I knew that the people who beat me up and shot me or shot at me were the same ones in the car the whole time because it was the same people talk to people and it was the same throughout. Isn't that a kind of at least an ear witness identification? That was the excited utterance that was admitted because Andre Freeman, the victim, wouldn't testify. But I mean, when you say nobody identified him, you do have the victim saying it was these two guys. They're the ones that beat me up. They're the ones who were in the car. They're the only ones. That's it. When you consider that if this is the only identification testimony, it seems fairly weak where you have somebody who very easily could have been in and out of consciousness, okay, who had been shot three times, who had been beaten up seemingly rather severely with a baseball bat, how he's saying, I was conscious the whole time and listening to their conversations and there was nobody else in the car and it was only these two guys. Isn't that at least as plausible as I got in the back seat and didn't notice somebody's legs coming out of the trunk? Well, there actually is an explanation for that that makes a great deal of sense, and that is that when Mr. Freeman was put in the trunk, the trunk, the back trunks have that little latch so you can drop the back of the seat down, that when he heard the police approach, so he knew that this was now over, then he pops the back seat so now he can stretch out and he's now partially in the back seat. When the police officer comes up and approaches the car, he sees, I don't know, Andre's legs in the back seat, but that was only there because just right then Andre had popped the seat and he was in the trunk before that, that there is a mechanism to do that. And so therefore it's not inconsistent. Andre Freeman did testify at a preliminary hearing and I believe there's a piece of that included in the appendix as well. But not at trial. He didn't testify at trial. The trial court ruled that that excited utterance was admissible. No, but the testimony about popping the trunk. I offer that as a... That's at the preliminary hearing? At the preliminary hearing rather than at the trial because he wasn't at the trial. Right. And so any identification testimony has to be looked at as less, I think, less than persuasive when it's coming from, I believe it was the paramedic or a police officer who talked to him at the hospital and he wasn't cross-examined on that. Do you agree or disagree with your opponent's assertion that under House and Goldblum we can look at the length of time between when this case was tried and when the new evidence, quote-unquote, surfaced, and making an assessment about both whether it's new and whether it's persuasive? I think that that is a sub rosa way to get the issue of diligence back into the game. And I don't think the issue of diligence is really appropriate. Just under the way House and Schlupp have evolved in the cases as well in this circuit. It's just another way to say that. The fact here is that Mr. Houck had counsel in his state court proceedings and he's writing to them saying, please raise this, please raise this, and it's not being raised. Does that excuse it? No, it doesn't. But does it certainly make us look at his own personal diligence, not the legal diligence of his side, but his personal diligence in trying to say, hey, I didn't do this. Please raise these issues and that it's not happening. So if you're going to get into the diligence issue on evidence that wasn't brought up by lawyers, I think it's a very thorny kind of problem here. Does it go to credibility? I suppose in some cases it might and in some cases it might not. I mean, if you're in jail and you're trying to get some lawyer to go call Kelly Edwards or go walk around the neighborhood, you're doing all you can. You can't very well go out and do that. It's a very difficult problem. So, you know, if you have somebody who's out or who has huge resources to go hire an investigator and they didn't do it for six years, you know, then maybe you have, you know, then maybe you could ask that. But then you're talking credibility and diligence in a whole different context. You're talking about it in the context of hearing about getting through the gateway. Any other questions? If I may just make one other point. We did seek a remand to the district court on the sufficiency of the showing as a part of the request for relief, if that's of significance. That's one of our alternative, that is the alternative request. And I could also direct the court's attention to the testimony regarding the time. It does vary anywhere from 3.30 to 5 o'clock. And that's Police Officer Akers, who's at the appendix 365, and Witness Michelle Brown, who says it was 3.30 to 3.45. So there is a range in there, which I guess is not surprising in cases like this. People get time all over the place. Thank you. Thank you very much. Good. We thank both counsel for excellent argument. We will take the case under advisement.